UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANDRZEJ SZCZEPANEK,

                Petitioner,

                                          ORDER
     -against-                             10-cv-2459(SJF)(ARL)

JAROSLAW DABEK, SYED ZAKI HOSSAIN,
MODERN PACKAGING, INC., PDF SEAL, INC.,
and FOIL SEAL, INC.

                Respondents.
------------------------------------------------------------X
FEUERSTEIN, J.

On May 28, 2010, petitioner Andrzej Szczepanek ("petitioner") filed a petition pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et seq.*, seeking to confirm an arbitration award dated May 26, 2010 ("the Final Award") issued by the American Arbitration Association in an arbitration entitled <u>Andrzej Szczepanek v. Jaroslaw Dabek, et al</u>. For the reasons set forth below, the petition is granted and the Final Award is confirmed.

I.     Background

    A.    Factual Background

Petitioner is a resident of Poland with his principal place of business located in Jejkowice, Poland. (Petition [Pet.], ¶ 1; Answer [Ans.], ¶ 1). Respondents Jaroslaw Dabek ("Dabek") and Syed Zaki Hossain ("Hossain") (collectively, "the individual respondents") reside and work in New York. (Pet., ¶ 2; Ans., ¶ 2). Respondents Modern Packaging, Inc. ("Modern Packaging"), PDF Seal, Inc. ("PDF") and Foil Seal, Inc. ("Foil Seal") (collectively, "the corporate

1

respondents") are New York corporations. (Pet., ¶ 2; Ans., ¶ 2).

On March 19, 2004, petitioner and the individual respondents, as owners of the shares of the capital stock of Foil Seal, entered into a Shareholders Agreement ("the Shareholders Agreement") pursuant to which they agreed, *inter alia*, to operate Foil Seal in the United States, with the possibility of "expand[ing] to anywhere in the Americas," as a business "engage[d] in printing, embossing and manufacturing of Pre-die cut sealing materials from aluminum foil or any other material to seal various types of container [sic]." (Pet., Ex. 2, ¶ 2). Pursuant to the Shareholders Agreement, petitioner and the individual respondents agreed not to "start and operate a new business which is similar and competitive to [Foil Seal's] business," nor to "have directly or indirectly any interest to [sic] any business which is competitive to [Foil Seal's] business, on territory anywhere in the Americas." (Pet., Ex. 2, ¶ 3).

The Shareholders Agreement contains the following arbitration clause:

> "Any dispute or controversy arising among the parties hereto regarding any term, covenant or condition of this Agreement or the breach thereof (other than a dispute arising from failure to pay indebtedness under any installment note) shall, upon written demand of any party hereto, be submitted to and determined by arbitration before the American Arbitration Association in accordance with the rules of the Association then in effect. Any award or decision rendered by arbitrator [sic] shall be final and binding upon the parties hereto. The arbitrators may not amend or vary any provision of this Agreement. Judgment upon the award or decision rendered by the arbitrators may be entered in any court of competent jurisdiction in Long Island, New York."

(Pet., Ex. 2, ¶ 15). In addition, the Shareholders Agreement provides, *inter alia*, that it "shall be governed by the laws of the State of New York," (Pet., Ex. 2, ¶ 18(a)); that it "may be terminated, waived or modified only by a written agreement executed by the party against which enforcement of such termination, waiver or modification is sought," (Pet., Ex. 2, ¶ 18(c)); and

that "the merger, consolidation, dissolution, liquidation or cessation of business activities of [Foil Seal]" and "the entering into, modification or termination of any lease, contract or agreement with [Foil Seal]" could only be taken "after approval of sixty five percent majority of the Shareholders of the Corporation," (Pet., Ex. 2, ¶¶ 11(c) and (d)). Under the Shareholders Agreement, petitioner owned forty percent (40%) of the shares of Foil Seal. (Pet., Ex. 2, ¶ 1).

By an e-mail sent to petitioner from Modern Packaging on June 29, 2004, Hossain indicated that since the "new" Shareholders Agreement "differ[ed] greatly in format [sic] and content" as compared with "[a]ll previously executed Foil Seal Inc. Shareholder Agreements," respondents "consider[ed] all previous Foil Seal Inc. Agreements * * * null and void." (Pet., Ex. 3). In addition, Hossain indicated that respondents' lawyers were "still finishing the new [Shareholders] agreement" and that, therefore, petitioner and respondents "should not conduct further activities until a signed document [was] in place." (Id.)

On December 30, 2004, PDF Seal was incorporated pursuant to Section 402 of the New York Business Corporation Law ("BCL"). (Pet., Ex. 4). At all relevant times, Dabek was the principal owner of PDF Seal, a new business started on January 3, 2005 engaged in the design and manufacturing of a safety seal. (Pet., Ex. 5). Petitioner alleges that PDF Seal is a competitor of Foil Seal. (Pet., ¶ 11).

On February 26, 2007, petitioner submitted his dispute to the American Arbitration Association ("AAA"), (Pet., ¶ 12; Ans., ¶ 12), which appointed Stephan D. Kramer, Esq. ("Kramer" or "the arbitrator") as the arbitrator. (Pet., Ex. 6). Kramer accepted the appointment on May 2, 2007. (Id.)

From August 2007 to April 2010, the parties filed memoranda on the bifurcated

arbitration, conducted discovery, secured experts' reports and presented testimony and documentary evidence to Kramer during a four (4) day hearing on the issue of liability on June 23, 26 and 27, 2008 and September 9, 2008, and a two (2) day hearing on the issue of damages on February 2 and 3, 2010. (Pet., ¶¶ 13-15; Ans., ¶¶ 13-15).

Kramer issued an Interim Award dated February 17, 2009 on the issue of liability, finding, *inter alia*: (1) that respondents' repudiation of the Shareholders Agreement without a vote of sixty-five percent (65%) of the shareholders constituted a breach of the agreement; (2) that since the Shareholders Agreement had not been properly terminated, respondents' operation of PDF Seal, a competitive business, constituted a breach of the Shareholders Agreement; and (3) that all respondents were liable for the breach of the Shareholders Agreement. (Pet., Ex. 7).

On or about May 26, 2010, Kramer issued a "Ruling on Motion for Adverse Inferences and Final Award of Arbitrator" ("the Final Award"). (Pet., Ex. 8). Kramer granted the branch of petitioner's motion seeking, *inter alia*, an award of attorney's fees as a sanction for respondents' bad faith conduct during discovery and ordered respondents to pay thirty percent (30%) of petitioner's attorney's fees. (Id., p. 3) Specifically, Kramer found "that the extra effort required of Mr. Rooney [petitioner's counsel] to deal constantly with discovery issues in this matter increased his legal fees by 30% over what would have been incurred without a string of discovery disputes, and I therefore order that Respondents pay 30% of [petitioner's] attorneys' fees for this proceeding as determined by [petitioner's] counsel with documentary backup. [Petitioner's] determination of the amount due will be deemed accurate absent manifest error." (Id.)

In the Final Award, Kramer, *inter alia*: (1) awarded petitioner economic damages in the total amount of three hundred seventy-six thousand three hundred one dollars ($376,301.00), to

which amount the attorney's fees sanctions award was to be added; and (2) directed (a) that post-judgment interest would accrue on both the damages and sanctions awards at a rate of nine percent (9%) from May 30, 2010 until paid in full and (b) that respondents reimburse petitioner the sum of four thousand five hundred dollars ($4,500.00), representing their portion of the AAA's administrative fees and Kramer's compensation and expenses. (Pet., Ex. 8).

B.  Procedural History

On May 28, 2010, within one (1) year after Kramer rendered the Final Award, petitioner filed the instant petition pursuant to the FAA, 9 U.S.C. §§ 1, *et seq.*, seeking to confirm Kramer's Final Award and to enter judgment against respondents on the relief granted in the Final Award. Petitioner seeks attorney's fees in the amount of nine hundred forty-four thousand six hundred four dollars and four cents ($944,604.04) to be added to the damages awarded by the arbitrator pursuant to the Final Award. (Affirmation of Richard Hamburger [Hamburger Aff.], Ex. H).

Respondents filed their answer to the petition on June 11, 2010, asserting, *inter alia*: (a) that the branches of the Final Award awarding economic damages in the amount of three hundred seventy-six thousand three hundred one dollars ($376,301.00), including interest thereon, and four thousand five hundred dollars ($4,500.00) as a reallocation of shared administrative expenses, were paid on June 4, 2010, (Ans., ¶¶ 21-22); and (b) that "[t]he documentary backup purportedly supporting a 30% award of legal fees" (i) "is insufficient to establish the reasonableness of [petitioner's] legal fees (which are grossly excessive)" and (ii) "contains 'manifest error,' within the meaning of the Final Arbitration Award," (Ans., ¶¶ 23-24). Respondents request confirmation of the Final Award "to reflect an award of 'zero' dollars" for

5

the amount of petitioner's attorney's fees or, in the alternative, an order directing petitioner to produce invoices or other contemporaneous time records in order to determine the reasonableness of the claimed amount of attorney's fees; and the exclusion from the legal fees award of amounts for any services rendered by non-lawyers and all services provided after April 16, 2010, the date the arbitration hearing record was declared closed, (Hamburger Aff., Ex. B). (Ans., "Wherefore" Clause). In addition, respondents request to be relieved of the requirement in the Final Award that they post a $1.45 million bond as security.[1]

Accordingly, the sole dispute in this proceeding involves the calculation of the thirty percent (30%) of petitioner's attorney's fees awarded by the arbitrator as a sanction against respondents for their bad faith conduct during the arbitration proceeding.[2]

II. Discussion

---

[1] In light of respondents' counsel's representation that the sum of one million sixty-eight thousand eight hundred twenty-seven dollars ($1,068,827.00) is on deposit in his escrow account, which is more than sufficient to satisfy the remaining amount due under the Final Award, it is unnecessary to address the parties' arguments regarding the posting of security in accordance with the Final Award.

[2] Respondents do not challenge the sanctions award of attorney's fees, nor could they since the broad arbitration clause at issue here "confers inherent authority on [the] arbitrator[] to sanction a party that participates in the arbitration in bad faith * * * [which] may include an award of attorney's * * * fees." ReliaStar Life Ins. Co. of New York v. EMC National Life Co., 564 F.3d 81, 86 (2d Cir. 2009). "[A]n award of attorney's fees [in circumstances where one party has acted in bad faith] [does] not contravene New York's public policy against punitive arbitration awards because the fees [are] compensatory, not penal, in nature and, thus, an appropriate form of damages granted to the aggrieved party." Id. (citing Synergy Gas Co. v. Sasso, 853 F.2d 59, 66 (2d Cir. 1988)). Rather, respondents only challenge the amount of fees claimed by petitioner, which was not determined by the arbitrator.

6

In his affirmation dated June 3, 2010[3], Paul K. Rooney, Esq. ("Rooney"), petitioner's counsel, avers that petitioner's prior counsel, Howrey LLP ("Howrey"), and his law firm incurred attorney's fees in the total amount of three million one hundred forty-eight thousand six hundred eighty dollars and fourteen cents. ($3,148,680.14). (Hamburger Aff., Ex. H). The "documentary backup" submitted by Rooney in support of petitioner's claim for attorney's fees incurred by Howrey include the name and description of the individual who performed the work, i.e., paralegal, associate, attorney or "other;" the date the work was performed; the hourly rate billed by that individual; the total number of hours billed, in quarter-hour increments; and the value of the work performed, i.e., the rate billed multiplied by the number of hours worked. (Id.) Petitioner provides no explanation of how this document was generated, by whom it was generated, when it was generated or for what purpose it was generated.

The "documentary backup" submitted in support of petitioner's claim for attorney's fees incurred by Rooney's firm consists of invoices to petitioner dated June 3, 2010 which include the date and hours, in quarter-hour increments, work was performed; the initials of the individual who performed the work; the hourly rate; and the amount billed. Again, petitioner provides no explanation of how, by whom, when or for what purpose those invoices were generated.

Notably absent from any of petitioner's "documentary backup" is the nature of the work performed by each individual. In response to the request of respondents' counsel that petitioner provide, *inter alia*, a description of the work performed by each individual, Rooney indicated in

---

[3] Although the caption indicates that Rooney's affirmation was submitted in the arbitration proceeding, it was dated June 3, 2010, after petitioner commenced the instant proceeding. Petitioner did not file the Rooney affirmation and supporting documentation in this Court, but respondent submits them in response to the petition. (Hamburger Aff., Ex. H). The amount of attorney's fees due petitioner was never decided in the arbitration proceeding.

7

an affirmation dated June 7, 2010 that Kramer did not direct petitioner to furnish the time charges, but rather only "directed that the 30% be '... determined by [petitioner's] counsel with documentary backup.'" (Hamburger Aff., Ex. I). Rooney refused "to expand" upon the documentation submitted in support of its determination of the amount of attorney's fees due petitioner on the basis, *inter alia*, that Kramer held that "[petitioner's] determination of the amount due will be deemed accurate absent manifest error." (Id.)

A. Manifest Error

Respondents contend that "[t]here are two blatant examples of manifest error in the 'documentary backup' provided by [petitioner]." (Respondents' Memorandum of Law in Response to [Petitioner's] Motion to Confirm and Arbitrator's Award Pursuant to the Federal Arbitration Act [Resp. Mem.], p. 2). First, petitioner seeks payment of twenty thousand nine hundred fifteen dollars and twenty-five cents ($20,915.25) for work performed by two (2) Howrey employees, Kinga Guzdek ("Guzdek") and Ludwig Von Rigal ("Von Rigal"), who are not designated as paralegals, associates or partners. Second, petitioner seeks payment for services rendered after the hearing record was declared closed on April 16, 2010. Specifically, the invoices indicate that petitioner was billed forty and a half (40.5) hours, at an hourly rate of seven hundred dollars ($700.00) an hour, for a total of twenty-eight thousand three hundred fifty dollars ($28,350.00), and for seventy-four (74) hours, at an hourly rate of three hundred sixty-five dollars ($365.00), for a total of twenty-seven thousand ten dollars ($27,010.00), for services rendered by Rooney and an associate, respectively, after the date the arbitration hearing was closed.

In response, Rooney identifies Guzdek as "a visiting foreign lawyer" and Von Rigal as "a lawyer from Germany," both of whom Howrey hired for the summer of 2008. (Reply Affidavit of Paul K. Rooney [Rooney Reply], ¶¶ 19[4]). According to Rooney, since Guzdek spoke Polish and received her legal education in Poland, she assisted in the preparation of a memorandum on a Polish tax issue requested by the arbitrator. (Id.) Rooney further claims that Von Rigal also "spent a very limited few hours on the Polish VAT Memorandum." (Id.) Since Guzdek and Von Rigal performed legal services akin to those provided by a legal assistant or legal intern, it was not "manifest error" for petitioner to include those services in the amount claimed for attorney's fees. However, absent evidence that either Guzdek or Von Rigal was actually admitted to the New York State Bar at the time they rendered services for Howrey, their services can only be billed at the prevailing rate charged in this District for legal interns or legal assistants. Accordingly, as set forth below, the hourly rates charged by petitioner's counsel for the services of Guzdek and Von Rigal constitute manifest error.

It was not manifest error for petitioner to include in the amount of attorney's fees incurred fees for services rendered after the close of the hearing record, since the arbitrator did not so limit his sanctions award. Rather, the arbitrator awarded attorney's fees to petitioner in the amount of "30% of [petitioner's] attorneys' fees for this proceeding * * *." (Hamburger Aff., Ex. 8).

Nonetheless, for the reasons set forth below, there is manifest error in the "documentary backup" provided by petitioner's counsel in support of his determination of the amount of attorney's fees incurred by petitioner, which rebuts the arbitrator's presumption that the amount determined to be due by petitioner is accurate.

---

[4] There are two (2) paragraphs designated "19" in Rooney's reply affidavit.

1. Sufficiency of "Documentary Backup"

Respondents contend that petitioner's "documentary backup" is insufficient to support an award of attorney's fees because it does not consist of contemporaneous time records and is vague and incomplete.

The arbitrator did not specify what "documentary backup" petitioner's counsel was required to submit in support of his determination of the amount of attorney's fees incurred by petitioner. However, in this Circuit, "contemporaneous time records are a prerequisite for [an award of] attorney's fees * * *." New York State Association for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147 (2d Cir. 1983). "All applications for attorney's fees * * * should normally be disallowed unless accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done." Id. at 1154; see also Lewis v. Coughlin, 801 F.2d 570, 577 (2d Cir. 1986) (finding that Carey required that "*no attorneys' fees could be collected if a fee application was not adequately documented after the date of [that] opinion.*" (emphasis in original)). The Second Circuit has recently clarified the rule set forth in Carey as thus: "[A]bsent unusual circumstances attorneys are required to submit contemporaneous [time] records with their fee applications." Scott v. City of New York, 626 F.3d 130, 133 (2d Cir. 2010). "[A]ny possible exceptions [to this general rule] are minimal and limited in scope" and apply "only in the rarest of cases." Id. The burden of producing the requisite contemporaneous time records is on the attorney submitting the application for attorney's fees. See Lewis, 801 F.2d at 577.

There is no indication in either the documents themselves or Rooney's affirmation that the "documentary backup" he submits in support of his determination of the amount of attorney's

fees incurred by petitioner was kept contemporaneously with the services performed. Indeed, the documentation regarding the fees of Rooney and his associate consists only of two (2) invoices to petitioner dated June 3, 2010 regarding professional services rendered from May 1, 2009 through, and including, June 1, 2010, which were clearly not made contemporaneously with the legal services performed by Rooney on petitioner's behalf. Moreover, all of the documents are patently insufficient insofar as they fail to indicate the nature of the services rendered or work performed by each individual.

The arbitrator's rulings that petitioner's determination need only be supported by unspecified "documentary backup" and would "be deemed accurate absent manifest error" resulted in some ambiguity as to what was required of petitioner's counsel in order to support his claim of the amount of attorney's fees due petitioner. Moreover, since the arbitrator determined that attorney's fees were appropriately awarded to petitioner as a sanction for respondents' bad faith during the arbitration proceeding, I decline respondents' request to award petitioner attorney's fees in the amount of "zero dollars."

2. Excessiveness of Fees

Manifest error is also apparent insofar as the amount of attorney's fees claimed by petitioner's counsel to have been incurred by petitioner is excessive.

"The most useful starting point for determining the amount of a reasonable [attorney's] fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); see also Green v. Torres, 361 F.3d 96, 98 (2d Cir. 2004). The resulting calculation is commonly

referred to as the "lodestar" figure, and it is strongly presumed to be a reasonable attorney's fee. Perdue v. Kenny A. ex rel. Winn, 130 S.Ct. 1662, 1673, 176 L.Ed.2d 494 (2010); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). The burden is on the fee applicant to submit evidence to support the number of hours expended and the rates claimed. Hensley, 461 U.S. at 437, 103 S.Ct. 1933.

a. Hours Expended

In determining the amount of hours reasonably expended, the court must

> "examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case. Efforts put into research, briefing and the preparation of a case can expand to fill the time available, and some judgment must be made in the awarding of fees as to diminishing returns from such further efforts. * * * In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties. (Citations omitted)."

Gierlinger v. Gleason, 160 F.3d 858, 876 (2d Cir. 1998).

"[E]xcessive, redundant, or otherwise unnecessary" hours should be excluded from the "lodestar" calculation. See Hensley, 461 U.S. at 434, 103 S.Ct. 1933. In reducing the "lodestar" amount, the court may exclude the excessive and unreasonable hours from its calculation by making an across-the-board reduction, or percentage cut, in the amount of hours. See Green v. City of New York, 2010 WL 5174937, at * 4 (2d Cir. Dec. 22, 2010); Luciano v. Olsten Corp., 109 F.3d 111, 117 (2d Cir. 1997).

Since petitioner has not identified the nature of any of the work performed in his

12

"documentary backup," the actual amount of redundant, duplicative and/or unnecessary work cannot be determined. Nonetheless, it can be ascertained from the documents submitted that petitioner's counsel and staff claim to have rendered professional services in excess of five thousand six hundred (5,600) hours for an arbitration proceeding that lasted for a period of approximately thirty-nine (39) months, which equates to roughly one hundred forty-four (144) hours per month or seven (7) hours a day in a five (5) day workweek for the entire period. Even considering, as found by the arbitrator, that undue hours needed to be expended by petitioner's counsel as a result of respondents' bad faith during discovery, the arbitration proceeding was not otherwise unusually complex, involved a six (6) day hearing and the preparation of memoranda and required only one (1) expert witness per side. Therefore, even on the vague and incomplete documents provided by petitioner, it is clear that the amount of attorney's fees sought are excessive and, thus, that petitioner's counsel's determination of the amount of attorney's fees due petitioner contains manifest error.

In order to exclude the excessive and unreasonable hours apparent from the "documentary backup" submitted in support of petitioner's counsel's determination of the amount of attorney's fees due petitioner, I find that an across-the-board reduction, or percentage cut, of forty percent (40%) of the amount claimed due by petitioner is appropriate. A forty percent (40%) cut of the number of hours claimed to be worked by petitioner's counsel equates to roughly eighty-five (85) hours per month, or a little more than half of every eight (8) hour workday in a five (5) day workweek, for the thirty-nine (39) month period during the pendency of this fairly straightforward arbitration, which is more than reasonable even accounting for respondents' obstructive conduct during discovery.

13

b. Hourly Rate

In determining a reasonable hourly rate, the court should consider the prevailing rates of lawyers with comparable skill, experience and reputation in the district in which the action was commenced and litigated. Missouri v. Jenkins by Agyei, 491 U.S. 274, 286, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); Luciano, 109 F.3d at 115. Rates should be "current rather than historic hourly rates." Reiter v. MTA New York City Transit Authority, 457 F.3d 224, 232 (2d Cir. 2006) (quoting Gierlinger, 160 F.3d at 882). Although an attorney's customary rate is a reasonable starting point in determining an hourly rate, Parrish v. Sollecito, 280 F.Supp.2d 145, 169-70 (S.D.N.Y. 2003), petitioner has not indicated what Rooney's or Howrey's customary rates are.

Recent prevailing hourly rates in the Eastern District are: (1) between two hundred dollars ($200.00) to four hundred dollars ($400.00) for partners, see, e.g. Stair v. Calhoun, 722 F.Supp.2d 258, 274 (E.D.N.Y. 2010) (finding the prevailing hourly rate for partners in the Eastern District of New York to be between $200.00 to $375.00); Dupler v. Costco Wholesale Corp., 705 F.Supp.2d 231, 245 n. 10 (E.D.N.Y. 2010) (finding the prevailing hourly rate for partners in the Eastern District of New York to be $300.00 to $400.00); Gesualdi v. Giacomelli Tile Inc., No. 09-CV-0711, 2010 WL 1049262, at * 3 (E.D.N.Y. Mar. 18, 2010) (finding the prevailing hourly rate for partners in the Eastern District of New York to be $200.00 to $350.00); (2) between one hundred dollars ($100.00) to two hundred ninety-five dollars ($295.00) for associates, see, e.g. Stair, 722 F.Supp.2d at 274 (citing cases); Gesualdi, 2010 WL 1049262, at * 3; and (3) between seventy dollars ($70.00) to eighty dollars ($80.00) for legal assistants, including paralegals, or legal interns, see, e.g. Stair, 722 F.Supp.2d at 274-5 (citing cases).

14

Accordingly, the fees charged by Rooney and Howrey, i.e., two hundred twenty-five dollars ($225.00) and three hundred thirty-five dollars ($335.00) for the legal assistance services rendered by Guzdek and Von Rigal, respectively; between one hundred fifty dollars ($150.00) to two hundred forty dollars ($240.00) for paralegal services; between two hundred twenty-five dollars ($225.00) to three hundred sixty-five dollars ($365.00) for services rendered by an associate; and between six hundred dollars ($600.00) to seven hundred fifty dollars ($750.00) for services rendered by a partner, are excessive and unreasonable, and constitute manifest error.

The argument of petitioner's counsel that "[g]iving [counsel] 30% of [their] time charges * * * translates into a general rate of less than $200 per hour * * * [which] is not excessive," (Reply Affidavit of Paul K. Rooney [Rooney Reply], ¶ 18), is disingenuous and evidence of the excessiveness of the fees claimed by petitioner.[5] Nowhere in the Final Award is there any suggestion that the arbitrator intended that petitioner's counsel should inflate the amount of fees claimed to such an extent that thirty percent (30%) of the inflated amount would allow them to recover a reasonable attorney's fee. Rather, the arbitrator intended only that petitioner's counsel recover thirty percent (30%) of a reasonable attorney's fee. Accordingly, it is patently clear that petitioner's determination of the amount of attorney's fees due petitioner contains manifest error.

In addition, Rooney attempts to justify the hourly rate charged for his associate's services, i.e., three hundred sixty-five dollars ($365.00), on the basis that the firm "rated her as associate and interpreter," based upon "her facility with the Polish language, * * * and her ability to

---

[5] Rooney makes similar assertions when attempting to justify his associate's hourly rate, i.e., that his associate's hourly rate "was fairly priced" and that "30% of [the associate's] hourly rate amounts to $109.50," (Rooney Reply, ¶ 24), as well as his own hourly rate, i.e., that "30% of [his] hourly rate of $700 amounts to $210," (Rooney Reply, ¶ 25), within the prevailing rate ranges in this District.

15

organize our rather large client file, to draft memoranda, and to do legal research." (Rooney Reply, ¶ 21). However, absent any detail as to the nature of the work performed by Rooney's associate, it is impossible to evaluate whether the work she performed justifies an hourly rate over one hundred dollars ($100.00) more than the prevailing rate in this District. The only detail Rooney provides is that during the liability phase of the hearing, his associate interpreted and translated for petitioner and his witnesses. (Rooney Reply, ¶¶ 22-23). However, interpreting services are distinct from legal services and are not awarded as a component of attorney's fees. Rooney's further contention that his associate was also "quite helpful with developing [petitioner's] Pre and Post Memoranda," (Rooney Reply, ¶ 23), provides little light on the actual services she rendered.

Since it is clear from Rooney's averments and the "documentary backup" that petitioner's counsel inflated the hourly rates by approximately thirty percent (30%) in order to recoup the full amount of what he believed to be a reasonable amount of the attorney's fees incurred by petitioner, the amount of attorney's fees claimed by petitioner's counsel will be further reduced by that percentage.

B. Adjusted Amount Due

Petitioner's counsel claims that petitioner incurred attorney's fees in the total amount of three million one hundred forty-eight thousand six hundred eighty dollars and fourteen cents ($3,148,680.14). However, since both the hours claimed to have been expended and the hourly rates charged by petitioner's counsel are patently excessive, it is appropriate to reduce the amount of attorney's fees claimed to have been incurred by petitioner by seventy percent (70%), i.e., a

forty percent (40%) reduction based upon the excessive hours and a thirty percent (30%) reduction based upon the inflated hourly rates charged. As adjusted, the total amount of attorney's fees incurred by petitioner is nine hundred forty-four thousand six hundred four dollars and four cents ($944,604.04).

Since the arbitrator ordered respondents to pay thirty percent (30%) of the total amount of attorney's fees incurred by petitioner, petitioner is awarded attorney's fees in the amount of two hundred eighty-three thousand three hundred eighty-one dollars and twenty-one cents ($283,381.21), plus interest in accordance with the Final Award.

III. Conclusion

The arbitrator's Final Award is confirmed and petitioner is awarded attorney's fees pursuant to the Final Award in the amount of two hundred eighty-three thousand three hundred eighty-one dollars and twenty-one cents ($283,381.21), plus interest in accordance with the Final Award. The Clerk of the Court shall enter judgment in favor of petitioner and against respondents in accordance with the Final Award and this Order and shall close this case.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: March 7, 2011
Central Islip, New York